UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUTHLA ALSAYER,<br><br>                    Plaintiff,<br>          -against-<br><br>OMNIX LABS, INC.,<br><br>                    Defendant. | Case No.:<br><br>**COMPLAINT** |

Plaintiff Muthla AlSayer, by her attorneys, Cohen Tauber Spievack & Wagner P.C., for her Complaint against defendant omniX Labs, Inc. (the "Company" or "defendant") states as follows:

## Nature of Action

1.  This action arises out of defendant's refusal to honor its obligations to repay a loan taken out in Ms. AlSayer's personal name for the benefit of defendant.[1]  The proceeds of the loan were used for the development and operations of defendant's business; however, when the loan matured, defendant refused to honor its commitment and obligation to repay the loan.  As a result, Ms. AlSayer has been forced to commence this action to seek redress from the Company.

## The Parties

2.  Ms. AlSayer is a resident of the State of Connecticut.  Prior to her role with the Company, she was the Chief Executive Officer at TagStone Technologies, an IoT (Internet-of-Things) technology stems integration company, and previously, she was a management consultant at Bridgewater Associates (which was, at the time, the world's largest hedge fund).

---

[1] As described below, the loan was taken in Kuwaiti currency; the current approximate value of what is due is $1,383,291.82 USD.

Ms. AlSayer worked with Bridgewater's executive management team to develop and roll out a suite of proprietary mobile applications designed to systematize the day-to-day operations of the firm.  Prior to Bridgewater, she was the Chief Technology Officer at Baroue, a Kuwaiti-based children's retailer, that at the time, was the Middle East's first entity to utilize Radio Frequency Identification (RFID) technology (*i.e.*, using radio waves to identify objects).  Ms. AlSayer began her career at Goldman Sachs, performing various information systems roles including corporate services project lead, software developer, and infrastructure engineer.

3. Upon information and belief, defendant is a Delaware corporation with a principal business address in New York, New York.

## Jurisdiction and Venue

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and because the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5. Venue is proper pursuant to 28 USC § 1391(b) because defendant resides in New York County and/or a substantial part of the events or omissions giving rise to the claims occurred in New York County.

## Allegations Relevant to Claims for Relief

*omniX Background and History*

6. omniX touts itself as a "subscription SaaS platform that provides real-time analytics for retailers. Leveraging computer vision and proprietary machine learning models, omniX captures data from existing cameras to help businesses drive more revenue per visit, increase margins, and operate more efficiently".

7. omniX was formed (initially as TagXLabs) in 2017 by Ms. AlSayer and Anoop Kanthan, who were acquainted from having worked together at Bridgewater Associates.

8. In 2015, Mr. Kanthan joined TagStone Technologies, an entity based in Kuwait and Dubai that was owned by an entity controlled by Ms. AlSayer's family. TagStone was engaged in deploying solutions utilizing RFID technology to manage assets in automotive, retail, and the energy sector.

9. In 2017, Ms. AlSayer's family decided to cease TagStone's operations, so Ms. AlSayer and Mr. Kanthan decided to form their own entity, TagXLabs (whose name was changed to omniX Labs in 2020), to focus on the development of an improved software offering using their knowledge of RFID technology.

10. At the Company's formation, Mr. Kanthan held a 40% interest and assumed the role of Chief Operating Officer; Ms. AlSayer held a 60% interest and acted as the Chief Executive Officer. (In 2019, Mr. Kanthan's title was switched to Chief Technology Officer, and in 2020, he became the CEO when Ms. AlSayer decided to no longer be involved in the operations of the Company.[2])

11. When TagXLabs was launched in 2017, Mr. Kanthan was responsible for the Company's day-to-day operations, while Ms. AlSayer dealt with overall strategy, sales, and raising the capital necessary to fund research and development and ongoing operations.

12. omniX developed a SaaS-based machine vision and learning platform to transform motion captured by cameras into actionable insights. The technology used existing cameras to connect in real time to process, analyze and transform data into cost savings and greater customer experiences. The technology was able to capture and identify a vehicle's

---

[2] By Spring 2020, Ms. AlSayer was no longer interested in remaining involved in the day-to-day operations of the Company. She reached an agreement with Mr. Kanthan whereby she agreed to give back 20% of her interest in the Company earmarked for the retention of key executives. Ms. AlSayer later learned that Mr. Kanthan unilaterally decided to seize the majority of the interest Ms. AlSayer agreed to give back to the Company (which was supposed to be used for executive hirings) for himself.

movements and paired customer identity with time and location awareness using POS integrated offerings. It enabled car-based access to personalized services, experiences, and locations. It was geared towards the automotive industry and was sold to car dealerships, car rentals, fast food drive-thru establishments, and was also used for trucking logistics.

*KNF Loan and Use of Proceeds*

13. Significant funds were needed to develop the product offered by the Company. As the Company had no operating or financial history (and was initially based in Kuwait), there were limited options available to fund the development of the necessary technology and pay for associated expenses.

14. As a result, in late 2017, Ms. AlSayer, in her capacity as the Manager of Tags Lab General Trading Company[3], entered into an agreement with the *National Fund For Small and Medium Enterprise Development* (the "Loan Agreement"), an entity affiliated with the Ministry of Justice of the State of Kuwait/Kuwait National Fund (the "Lender" or "KNF"), whereunder the Lender agreed to provide KWD 400,000.00 -- in three installments of KWD 150,000 (at signing), 150,000 (within three months of signing) and 100,000 (within six months of signing) -- to Ms. AlSayer for use in the business.

15. Ms. AlSayer executed the Loan Agreement because, in order to qualify for the loan from the Lender, the borrower needed to have a Kuwaiti founder, bank account, office, and business license (all of which Ms. AlSayer was able to provide) and the fledgling business operated by Mr. Kanthan and Ms. AlSayer did not have sufficient qualifications for the loan which was needed to fund the development and operations of the business.

---

[3] This was a Kuwaiti entity formed by Ms. AlSayer to enable the Company to receive funding through KNF.

16. Prior to obtaining the loan, Ms. AlSayer and Mr. Kanthan explicitly discussed and agreed that Ms. AlSayer would personally take out the loan on behalf of the Company and the Company would bear responsibility for repayment of the loan. At all times, this was the understanding.

17. Mr. Kanthan was, at all times, fully aware of the Loan Agreement and structure. At all times, it was understood that the loan was being taken out for the benefit of the Company (as acknowledged by Mr. Kanthan). All of the funds received from KNF were used for the Company, which, at the time the Loan Agreement was executed, was 100% owned by Ms. AlSayer and Mr. Kanthan.

18. The majority of the proceeds from the loan were spent on software and product development, with the balance spent on items such as legal and accounting services, rent, marketing and advertising, travel expenses, and employee salaries and compensation, including payments to Mr. Kanthan (Ms. AlSayer did not receive any compensation).

19. At all times, Mr. Kanthan was fully aware of the use of the borrowed funds. In fact, he was directly involved with the preparation of monthly reports presented to the Lender detailing the use of the loan proceeds.

20. Furthermore, Mr. Kanthan represented to numerous potential investors/partners that KNF "provided initial round funding" of $1.3 million to the Company and he circulated an investor deck (that he had a primary role in preparing) which highlighted "seed round" funding in the Company by KNF as a "Key Achievement".

21. As a direct result of the funds received from KNF, the Company was able to pay for the development of the software needed for the marketing and sales of the SaaS product that

was sold to customers. (In fact, the design company retained to help with product development and strategy ended up investing in the Company.)

22. The loan has now matured. Ms. AlSayer's current obligation to the Lender is approximately KWD 420,453.44 (loan + fees), which equals USD $1,383,291.82 based on the current conversion rate (1 Diner = 3.29 USD).

*EverWash and Merger with omniX*

23. EverWash, Inc. (EverWash) is a car wash network with more than 750 participating locations across the United States. It is a self-described "team of membership experts provide ongoing sales, marketing and customer support to partner washes, while the EverWash App gives customers the ability to sign-up for and manage their membership anytime and anywhere".

24. In or around 2019, EverWash became a customer of the Company, utilizing the Company's SaaS product to help identify vehicles for its network of car washes.

25. EverWash engaged in discussions with Mr. Kanthan regarding a potential investment in the Company, which led to a $125,000 investment in the Company in or around May 2020.

26. On November 15, 2021, a press release was issued which publicly announced that:

> EverWash, the US leader in car wash membership and subscription management, announced that it has acquired omniX Labs, an industry-leading real-time vehicle analytics and Machine Learning (ML) platform. This acquisition will deepen EverWash's capability to gain key sales and marketing insights at car washes to benefit their wash partners and customers. Together, EverWash and omniX Labs will use vehicle-centric data to improve the car care life cycle experience and generate more revenue for wash partners.
>
> "As proven leader in the innovation and development of the car wash membership business, EverWash efficiently provides a mobile platform for subscribers and robust

end-to-end solution for car wash operators," said Scott Caplan, Co-Founder and President of EverWash. "In order for our business to embark on the next leg of our high-growth journey, the acquisition of omniX Labs will accelerate our ability to provide even more vehicle-centric actionable data that we can use to personalize the customers' experience and improve the operators' bottom line."

"omniX Labs shares EverWash's commitment to actionable data for the pursuit of client and customer success," said Anoop Kanthan, CEO & Co-Founder of omniX Labs. "We're excited to contribute to their expansion by continuing to provide intelligent sets of eyes to help optimize the car wash experience. Ultimately, our insights will enable both EverWash and omniX to develop the next generation of car care solutions via the vehicle becoming an extension of the consumer's wallet."

EverWash and omniX Labs have been working together since May 2020, but this complete merger will bring two leading technology platforms together to provide car care operators and retailers full lifecycle visibility into their customers.

27. The press release that was issued contained outright false and misleading statements, as at that time, the Company and EverWash were simply engaged in advanced discussions regarding a potential transaction.

28. On or about January 12, 2022, the Company and EverWash actually consummated a transaction whereby the entities were merged, with omniX Labs, Inc. as the surviving entity. Pursuant to the merger, Company shareholders[4] received consideration of approximately $10 million, 20% of which was paid in cash, with the balance paid in shares of the merged entity.

29. In connection with this transaction (and only after Ms. AlSayer had to engage counsel to demand what she was entitled to under the transaction), Ms. AlSayer received a cash payment and shares in omniX. (At the time of the transaction, Ms. AlSayer owned

---

[4] Mainly through Ms. AlSayer's efforts, the Company had raised approximately $1.6 million through various mechanisms (granting options, SAFE (Simple Agreement for Future Equity) agreements, direct equity investments, issuing convertible notes, etc.) so that, at the time of the merger with EverWash, there were numerous interestholders.

approximately 21% of the Company and was its second largest shareholder behind Mr. Kanthan, who owned approximately 23%.)

30. However, despite multiple demands, the Company has refused to recognize and fulfill its obligations to Ms. AlSayer in connection with the KNF loan.[5]

31. In response to Ms. AlSayer's demands related to the loan, the Company has apparently assumed the position that "$182,000 of the borrowed funds were a capital contribution by Ms. AlSayer and/or that the funds were used for other ventures unrelated to the Company". These statements are false (as well as contradictory). (Even assuming *arguendo*, that $182,000 was a capital contribution (which is not accurate), the Company would still be responsible for the balance of the $1,383,291.82 due.)

32. Based on the foregoing, Ms. AlSayer has been forced to commence this action to ensure that the Company fulfills its commitment and obligation regarding the KNF loan.

**First Claim for Relief: Breach of Oral Agreement**

33. Plaintiff repeats the allegations contained in paragraphs 1 through 32 above as if fully set forth herein.

34. Based on the discussions between Ms. AlSayer and Mr. Kanthan, an oral agreement was reached whereby defendant agreed to be obligated for Ms. AlSayer's obligations under the Loan Agreement.

---

[5] Ms. AlSayer repeatedly brought up the Company's obligation to repay the loan to Mr. Kanthan, including in an e-mail exchange wherein she told Mr. Kanthan: "You gave your word that KNF will be taken care of down the line . . . This is pretty low Anoop and I have been left holding the bag here with all this debt pinned on me personally. This is a company debt."

35. As described above, Ms. AlSayer fulfilled her obligations under the oral agreement by entering into the Loan Agreement and making the proceeds from the loan available to defendant to use for its business purposes (which it did).

36. As described above, defendant has failed to fulfill its agreement to bear responsibility for Ms. AlSayer's obligations to KNF and is thereby in breach of the oral agreement.

37. As a direct and proximate cause of defendant's breach of the oral agreement, Ms. AlSayer has been and will be damaged, in an amount to be determined at trial, but in no event less than $1,383,291.82, plus any interest, costs, and expenses which may be due.

### Second Claim for Relief: Breach of Implied Agreement

38. Plaintiff repeats the allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

39. Based on the events as described above, an implied agreement was reached between Ms. AlSayer and defendant whereby defendant agreed to be obligated for Ms. AlSayer's obligations under the Loan Agreement.

40. As described above, Ms. AlSayer fulfilled her obligations under the implied agreement by entering into the Loan Agreement and making the proceeds from the loan available to defendant to use for its business purposes (which it did).

41. As described above, defendant has failed to fulfill its agreement to bear responsibility for Ms. AlSayer's obligations to KNF and is thereby in breach of the implied agreement.

42. As a direct and proximate cause of defendant's breach of the implied agreement, Ms. AlSayer has been and will be damaged, in an amount to be determined at trial, but in no event less than $1,383,291.82, plus any interest, costs, and expenses which may be due.

### Third Claim for Relief: Unjust Enrichment

43. Plaintiff repeats the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

44. As described above, defendant received the benefits from the Loan Agreement between Ms. AlSayer and KNF.

45. Under the circumstances described above, it would be unjust for defendant to retain the benefits of the Loan Agreement entered into by Ms. AlSayer.

46. Defendant has therefore been unjustly enriched and it would be unjust, inequitable, and not in good conscience for defendant to retain the benefits it was conferred as a result of the actions taken by Ms. AlSayer.

47. Ms. AlSayer deserves to be compensated for the benefits received by defendant, in an amount to be determined at trial, but in no event less than $1,383,291.82, plus any interest, costs, and expenses which may be due.

### Fourth Claim for Relief: Indemnity (Under Delaware law)[6]

48. Plaintiff repeats the allegations contained in paragraphs 1 through 47 above as if fully set forth herein.

49. As described above, the Loan Agreement was executed by Ms. AlSayer for the benefit of the Company in connection with her role as CEO of the Company.

---

[6] The Company is incorporated in Delaware.

50. As described above, Ms. AlSayer incurred a liability in connection with her role as CEO of the Company for which the Company bears responsibility.

51. As a result, Ms. AlSayer is entitled to be fully and completely indemnified by the Company for any and all liabilities she has incurred or may incur in connection with the Loan Agreement, and is entitled to an order of the Court declaring such a right.

### Fifth Claim for Relief: Declaratory Relief

52. Plaintiff repeats the allegations contained in paragraphs 1 through 51 above as is fully set forth herein.

53. Based on the events described above, an actual controversy exists as to whether the Company is liable for the obligations undertaken by Ms. AlSayer in connection with the Loan Agreement.

54. Ms. AlSayer is without an adequate remedy at law.

55. Based on the events described above, Ms. AlSayer is entitled to an order from the Court declaring that the Company is fully and completely liable for any obligations of Ms. AlSayer in connection with the Loan Agreement.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against defendant as set forth above, together with such other and further relief as may be just and proper.

Dated: March 31, 2022

          COHEN TAUBER SPIEVACK & WAGNER P.C.
*Counsel for Plaintiff*

By: /s/ Kenneth J. Rubinstein
Kenneth J. Rubinstein
420 Lexington Avenue
Suite 2400
New York, New York 10170
Tel.: (212) 586-5800
krubinstein@ctswlaw.com