UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/15/2025
```

-------------------------------------------------------------------X
                           :

MUTHLA ALSAYER,                    :

               Plaintiff,      :

                        :        22-cv-2628 (LJL)

     -v-                    :

                        :       <u>OPINION AND ORDER</u>

OMNIX LABS, INC.,            :

                        :

             Defendant.    :

                        :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Muthla AlSayer ("Plaintiff" or "AlSayer") brings this action against Defendant OmniX Labs, Inc. ("Defendant" or "OmniX") alleging claims for breach of oral agreement, breach of implied agreement, unjust enrichment, indemnity, and declaratory relief. *See* Dkt. No. 1 ("Complaint" or "Compl.").

The Court conducted a bench trial in this action on December 16, 2024. The Court received direct testimony from Muthla AlSayer, Anoop Kanthan, and Scott Kaplan. Dkt. Nos. 88–90. Each witness provided live testimony on cross-examination, re-direct examination, and recross-examination. The parties each submitted proposed findings of fact and conclusions of law, Dkt. Nos. 91–92, and a pretrial brief, Dkt. Nos. 93–94. The Court heard closing statements after the conclusion of the trial, on January 8, 2025.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, the Court concludes that OmniX breached an implied agreement with Plaintiff, and Plaintiff is entitled to declaratory relief.

## FINDINGS OF FACT

### I.    The Parties

Muthla AlSayer is a citizen of Kuwait.  PX 69 ("AlSayer Decl.") ¶ 2.  From late 2011

through July 2014, she was a management consultant at Bridgewater Associates.  *Id.* ¶ 6.  While

she was at Bridgewater Associates, she worked with Anoop Kanthan.  *Id.* ¶ 9.  When AlSayer

left Bridgewater, she became Chief Executive Officer ("CEO") of TagStone Technology

("TagStone"), an entity controlled by her family that was based out of Kuwait and Dubai.  *Id.* ¶

7.  TagStone used RFID[1] technology to manage assets in the automotive, retail, and energy

sectors.  *Id.* ¶ 8; DX 1a ("Kanthan Decl.) ¶ 4.  Beginning in early 2015, Kanthan joined TagStone

as Chief Operating Officer ("COO").  Kanthan Decl. ¶ 4; AlSayer Decl. ¶ 9.

In early August 2017, AlSayer and Kanthan formed a Delaware business corporation

called TagXLabs (the "Company" or "Defendant"), which was later renamed OmniX and is the

defendant in this action.  Kanthan Decl. ¶ 5; AlSayer Decl. ¶¶ 10–11.  When TagXLabs was

founded, AlSayer held a 60% interest and the role of Chief Executive Officer, and Kanthan had a

40% interest and the role of Chief Operating Officer.  AlSayer Decl. ¶ 11; Kanthan Decl. ¶ 7.

AlSayer was the sole member of the Board of Directors.  DX 37; Kanthan Decl. ¶ 7.  Kanthan

was responsible for the Company's day-to-day operations, while AlSayer dealt with overall

strategy, sales, and raising capital.  Kanthan Decl. ¶ 6; AlSayer Decl. ¶ 12.  At that time, AlSayer

and Kanthan were the only members of the Company.  AlSayer Decl. ¶ 26; Tr. 10:11–12.  While

---

[1] RFID stands for "Radio Frequency Identification."  PX2.  An RFID tag placed on an individual
or object communicates with other hardware to allow the individual or object to be tracked.
Tr. 17:4–18:7; PX2.  The technology is used in applications such as E-ZPass, locating
merchandise within a warehouse, and finding equipment within a hospital.  PX2; Dkt. No. 95
("Trial Transcript" or "Tr.") 17:5.

working for TagXLabs in 2017 and 2018, Kanthan also continued working for TagStone.  Tr. 11:9–13.

## II.    The KNF Loan

AlSayer and Kanthan began to focus on creating the new company which would eventually be incorporated as TagXLabs in or around early 2017.  AlSayer Decl. ¶ 10; Tr. 11:9–13.  AlSayer, who is a citizen of Kuwait, was aware of a loan program administered by the Kuwaiti National Fund for Small and Medium Enterprise Development ("KNF").  AlSayer Decl. ¶ 16.  The KNF is an independent entity affiliated with the Kuwait government which sponsors small and medium sized businesses fully owned by Kuwaiti citizens.  Kanthan Decl. ¶ 9; AlSayer Decl. ¶¶ 15–17.  To be eligible for a loan, a borrower needed to have a Kuwaiti owner, be based on Kuwait, have a Kuwaiti bank account, and comply with certain asset guidelines.  Kanthan Decl. ¶ 9; AlSayer Decl. ¶¶ 17–18; Tr. 146:18–25.

AlSayer testified that she and Kanthan "weren't going to tap [AlSayer's] family again" for money for the new startup, and therefore turned to the KNF.  Tr. 142:4–8.  It was an attractive source of startup financing, and she believed they would be able to ask for more time if they could not repay the loan.  Tr. 142:4–8.  AlSayer also knew that loans through the program were only available to Kuwaiti citizens and companies.  AlSayer Decl. ¶¶ 16–17.  AlSayer and Kanthan discussed a plan to take out a loan from the KNF and use the funds for the company they were building.  *Id.* ¶¶ 18, 25.  The two of them discussed that the money would be used for the new company and that if they got the loan they would "figure out" how to repay it.  Tr. 141:1–142:16.  Kanthan and AlSayer also discussed the general terms of the KNF loan agreement.  Tr. 107:1–4, 158:18–22, 159:11–15.  Kanthan testified that although they saw at that time that the KNF funding was a loan on paper, AlSayer was "confident it was a grant."  Tr. 107:1–4.

In March 2017, AlSayer and Kanthan applied for funding from the KNF for a business referred to as "TagEye" or "Tag Vision."  PX2, 3, 4; AlSayer Decl. ¶ 19; Tr. 15:3.  The "TagEye" business plan describes a general asset tracking company which could operate across sectors.  PX2.  Kanthan helped AlSayer respond to financial inquiries from the KNF about the project and put together financials for the business.  PX 3, 4; Tr. 159:18–25.  In July 2017, the KNF approved the loan application.  Tr. 131:2.

Although the KNF loan could only go to a Kuwaiti company, AlSayer and Kanthan did not initially incorporate a company in Kuwait.  Rather, at the beginning of August 2017, AlSayer and Kanthan were in the process of finalizing the incorporation of TagXLabs in Delaware.  PX6, 7; Tr. 22:1–6.  On August 1, 2017, a few days before the Company was formally incorporated, Kanthan signed a contract on behalf of TagXLabs with IDEO, a consulting firm.  PX5, Tr. 20:10–12.  Kanthan noted in an email exchange that the company could sign as TagStone and change it later, but he would prefer to sign as TagXLabs because "it links to the Kuwait Fund approval."  PX6.  The contract with IDEO identified the business of TagXLabs as "Computer Vision for Automobile Asset Tracking."  PX6.  IDEO agreed to provide consulting services to help launch TagXLabs over seven weeks for a fee of $400,000, $150,000 of which was accepted as a convertible note.  PX5, 6; Tr. 100:21–101:1.  Part of the impetus for incorporating TagXLabs was so that IDEO could invest in the Company.  Tr. 169:5.  When TagXLabs was incorporated, Kanthan stated in an email that one of the "next steps" was "[s]etup loan agreement from Kuwait entity."  PX8.

On August 22, 2017, AlSayer formed a Kuwaiti sole proprietorship named Tags Lab General Trading Company ("Tags Lab").  PX8.  AlSayer created Tags Lab because the U.S. entity TagXLabs was not eligible for KNF funding, which could only go to a Kuwaiti company

with Kuwaiti ownership.  AlSayer Decl. ¶ 18.  Therefore, AlSayer formed the Kuwaiti entity

Tags Lab to sign for the KNF loan, with the understanding that the money would be used for

TagXLabs.  *Id.*; Tr. 158:9–13 ("That vehicle was created solely to take the funds . . .").  There

was no formal documentation of the connection between Tags Lab and Defendant TagXLabs or

OmniX.  Tr. 142:14–16. [2]

On November 12, 2017, AlSayer signed a loan agreement with the KNF.  PX 9.  The

original agreement is in Arabic.  *Id.*  The English translation of the agreement states that Second

Party to the Agreement is Muthla AlSayer, "in her capacity as the manager of, sole partner in,

and authorized signatory for the / Tags Lab General Trading Company / a for-profit sole

proprietorship."  PX 9.  The loan agreement states that the KNF agreed to provide a total

financing amount of 400,000 Kuwaiti dinars (KWD) to the Second Party.  *Id.*  The money was to

be deposited in installments of KWD 150,000 at signing, KWD 150,000 within three months of

signing, and KWD 100,000 within six months of signing.  *Id.*  At that time, KWD 400,000 was

equivalent to about $1.3 million USD.  AlSayer Decl. ¶ 15.

The agreement also places obligations on the borrower.  It requires the borrower to

"deposit into the project's account its share of the financing, totaling 20% of the value of each

financing installment, that the First Party [KNF] deposits."  PX9 at 2.  "If the Second Party pays

a sum corresponding to this share for incorporation or for supply or purchase of equipment, [she]

shall be responsible for proving the amount [she] has paid."  *Id.*  The agreement also requires the

---

[2] On September 14, 2017, counsel for TagXLabs sent an email suggesting that he had created a "loan agreement between Tagxlabs – Kuwait and Tagxlabs – US" for up to $400,000.  DX45. Kanthan describes this in an email exchange as "the loan to show the flow between Kuwait and the US entity."  *Id.*  AlSayer testified that "at the beginning we were going to connect" the companies, but then "we got worried that KNF actually can [] shut down our business," and "we wanted to keep clean the loan funds from the investors' funds."  Tr. 164:21–165:2.

borrower to comply with the action plan that had been approved by the KNF and "only use this financing for its designated purpose." *Id.*   The borrower is required to provide monthly financial statements and an annual budget which includes a statement of "all expenses related to the project." *Id.* at 3–4.  The borrower is forbidden from making "any decision that impacts the fate of the project" without approval from the KNF, and merger or sale of the project entitles the KNF, "pursuant to a final court judgment, to take possession of the project." *Id.* at 5.

The agreement states that the borrower will pay back the debt in thirty-six installments beginning after a twelve-month grace period from the date on which the first financing amount is deposited. *Id.* at 3.  It is permissible for the borrower to expedite payment or for the parties to restructure the debt. *Id.* at 4.  Upon breach of the agreement by the borrower, the KNF has the right to consider the contract terminated, suspend disbursement of further payments, and consider all outstanding sums immediately due. *Id.* at 5.

In connection with the loan, AlSayer was also required to execute a "Debt Declaration + Surety." PX10.  The original of this document is in Arabic. *Id.*  The English translation states that AlSayer "appeared and stated that she is a joint surety with (Tags Lab General Trading Company)" and undertakes to pay the debt to the KNF "in case the debtor fails to fulfil and pay it." *Id.*

## III.    Use of the KNF Funds

Kanthan and AlSayer circulated documents  to potential investors stating that the KNF provided funding of $1.3 million to OmniX and describing this as a "Key Achievement."  PX 12, 15, 16, 24, 27; DX88; *see* Tr. 22:1–32:25.  On January 10, 2018, Kanthan sent a bullet point overview of the Company to Cooley, LLP, a law firm retained by the Company, which stated "July '17 – Kuwait National Fund provided initial round funding."  PX 15.  When asked how much funding was received, he responded "$1.3M USD." *Id.*  A slide deck prepared by IDEO

from information given by TagXLabs also stated that seed funding for the company was provided by the KNF. PX12; Tr. 25:24, 27:19. On April 4, 2018, Kanthan stated in an email to a potential investor that OmniX had an investment from the KNF. PX27.

All of the funds received from the KNF were deposited in a bank account at Gulf Bank for which AlSayer was the sole signatory. AlSayer Decl. ¶ 23. Between September 2017 and September 2018, a total of KWD 508,145 was deposited in the Gulf Bank Account. PX40. This total included KWD 400,000 from the KNF loan and KWD 108,145 deposited by AlSayer or her family. PX40; Tr. 64:5, 88:13–25, 134:10–23. All of these funds were spent between September 2017 and October 2018. PX40; Tr. 11:24–12:2.

The account was opened in late September 2017 with a deposit of KWD 205. PX13, 40. On October 24, 2017, KWD 40,000 was deposited in the account, labeled "Investment/Capital." PX13. The next deposit in the account was the first installment of the KNF loan, totaling KWD 150,000, on January 3, 2018. PX13, 40. Another deposit of KWD 40,000 labeled "Investment/Capital," occurred on January 24, 2018. PX40. The second installment of the KNF loan, totaling KWD 150,000, was deposited on April 26, 2018. PX40. On May 8, 2018, KWD 20,000 was deposited, labeled as "Investment/Capital" and marked by bookkeeper Edna D'Souza[3] as "Funds received from MS Holding." PX40. Three smaller deposits of KWD 3,150 (twice) and KWD 1,640 were made between July and September 2018, also labeled as "Investment/Capital" and marked by D'Souza as "Funds received from MS Holding." PX 40. The third installment of the KNF loan, totaling KWD 100,000, was deposited on August 8, 2018.

---

[3] In 2018 and 2019, TagXLabs had an accounting firm, Zelin & Associates, which handled the formal books and records and tax filings, and Edna D'Souza handled day-to-day financials. Tr. 37:16–18.

*Id.* No other deposits were made between that time and the end of September 2018, when the last of the funds were spend. *Id.*

Tags Lab was required to maintain regular contact with KNF and provide documentation of how the proceeds of the loan were used. AlSayer Decl. ¶ 30; PX13, 14, 17, 18, 31, 33, 34, 36, 37, 39. Kanthan and D'Souza prepared these financial reports, which were sent to the KNF and the KNF's auditor's, KPMG. Tr. 42:1–15, PX 13, 31, 36, 37, 39. These reports generally included spreadsheets headed "TagXLabs" or "TagXLabs - Kuwait" with entries for movement of funds in and out of the bank account. PX 13, 14, 31, 36, 37, 39. They also included invoices and other documentation of the use of funds. PX13, 14, 31, 36, 37, 39. Kanthan often sent these movement reports to AlSayer from his omnixlabs.com email address to forward to the KNF. PX36, 37, 39; Tr. 58:19–25, 62:12–24. The KNF loan was listed as a liability of "TagXLabs – Kuwait" on certain accounting spreadsheets used in the movement reports. PX37, 39.

Tags Lab had no revenue, and never did any business other than taking the loan funds and using them to pay expenses of TagXLabs. Tr. 132:5, 167:9. It had no website, and consisted of "one person and a little small office we had to rent." Tr. 167:19–20. It was solely a vehicle to get the KNF funds. Tr. 143:12–13; 167:11.

Tags Lab was consistently referred to as "TagXLabs – Kuwait" in accounting documents. PX 13, 14, 17, 31, 36, 37, 39. Tags Lab was also referred to as TagXLabs in business contexts. Several contracts paid by Tags Lab are signed by "TagXLabs, W.L.L.," a Kuwaiti entity. PX17, PX31.[4] Invoices for "TagXLabs, W.L.L" were also paid by Tags Lab. PX17, 31. Counsel for

---

[4] The evidence is clear that only two corporate entities were associated with the TagXLabs brand: the Kuwaiti entity Tags Lab and the Delaware entity TagXLabs, which later became OmniX. *See* Tr. 50:21–22. There is conflicting evidence as to whether "TagXLabs, W.L.L" refers to the Kuwaiti entity Tags Lab or the Delaware entity TagXLabs. Tr. 49:14–50:22.

the U.S. entity TagXLabs refers to a TagXLabs Kuwaiti entity.  DX45.  No separate Kuwaiti entity existed with the name "TagXLabs."  Tr. 50:21–22.  Rather, Tags Lab was doing business under the TagXLabs name.  Tr. 49:14–50:22.

Kanthan, who was not employed by Tags Lab but was COO of the U.S. entity TagXLabs, was intimately involved with tracking financials for the loan.  PX36, 37, 39.  In emails, he referred to Tags Lab as TagXLabs.  PX36, 39.  AlSayer testified repeatedly that she regards Tags Lab and the U.S. entity TagXLabs or OmniX as one business.  Tr. 144:1–2, 145:18–19, 146:2–5.

All or almost all of the money in the Gulf Bank account was used to pay the expenses of growing TagXLabs.[5]  For example, on January 8, 2018, $100,000 was transferred from the account to pay IDEO on its August 2017 consulting contract with TagXLabs.  PX40; Tr. 25:11–15, 100:21–101:1.  On January 11, 2018, two payments of $6,394.85 (KWD 1,939) were made to Studio Diseno from the account for "Design signoff for omni and Tagx," PX 13, which Kanthan testified was "some design mock-up work for TagXLabs, Incorporated."  Tr. 44:17–18.  In February and March 2018, payments of $2,850 and $5,850 were made to James Markowski, counsel for the U.S. entity TagXLabs, for services including the incorporation of that entity.  Tr. 45:6–13, 52:13; PX13, 17, 31.[6]  On August 29, 2018, $109,500 was transferred to Creative

---

[5] One invoice paid from the account, from Pace Systems for £1,750, appears to be an invoice to TagStone.  PX31.

[6] Defendant concedes that the payments to IDEO and Markowski were made for the benefit of the TagXLabs.  The parties also agree that the following payments were made for expenses of the U.S. entity TagXLabs: payment of invoices from Hybrid Group for 2,424 AED in February 2018 and 9,990.46 AED in March 2018, PX17, 31; Tr. 53:22, payment of $5,500 to Jared Fuller consulting, PX31; Tr. 52:7, payment of April 2018 invoices to Gigster for a total of $15,000, PX31, Tr. 53:11, and payment of an invoice for iconography design for AED 2,000, PX31, Tr. 54:8.

House Services FZ LLC ("Creative House") to pay a contract for software and marketing services including ""design and build of the omnixlabs.com site." PX37; Tr. 174:2–4.[7]

The most significant expense on the account was the payment of invoices from TagStone pursuant to a "Software Maintenance and Support Agreement" of November 10, 2017, and a later change order. PX17, 31; DX69. Under the initial maintenance and support contract, "Tagxlabs W.L.L," agreed to pay $750,000 for maintenance and support of software which had been sold to TagXLabs under a prior contract. PX17. The change order provided for additional support services up to $100,000. DX69. AlSayer testified that TagXLabs relied on TagStone to build its software due to TagStone's expertise in this area. Tr. 170:13–22; AlSayer Decl. ¶ 35. On October 2, 2018, the United States entity TagXLabs executed a statement of work providing for additional support services up to $100,000, which stated it "shall become part of" an existing binding agreement between the parties. DX70. The parties have not provided any existing agreement this could refer to other than the agreement between "Tagxlabs W.L.L" and TagStone.

In sum, between September 2017 and October 2018, the KNF funds and partially matching funds deposited by AlSayer were paid out from Tags Lab to cover the expenses of growing the business TagXLabs. [8] This is in line with the Company's representations to investors that it was funded by the KNF. PX 12, 15, 16, 24, 27. Some contracts and invoices

---

[7] Kanthan testified that "I don't know why this is here, because Creative House . . . never built or did the omnixlabs.com site," which was created by a freelance developer. Tr. 93:7–17. This testimony does not explain why Creative House had a contract to create the OmniX website, and is therefore not credible. AlSayer testified that Creative House "did create the first version of the website, but we didn't like it." Tr. 174:2–4. This testimony is credible, as it is consistent with the terms of the contract as well as with Kanthan's testimony that a freelance developer eventually created the website.

[8] Other payments from the account include a payment to RK Consulting Services related to an invoice for $106,000, PX17, payroll payments to individuals such as D'Souza and Edwin Cunanan, PX31, and expense reimbursements to AlSayer and others, *id*.

paid by Tags Lab were attributed to the U.S. entity TagXLabs, PX5, 31, while others were attributed to "TagXLabs, W.L.L," the Kuwaiti entity.  PX17, 31.  Regardless of their formal attribution, these expenses were part of a common project of growing the business formally incorporated in Delaware as TagXLabs.  Tr. 158:3–13, 162:21, 167:13, 174:11.  Tags Lab had no other business, and when the funds were spent it ceased operations.  Tr. 143:12–13.

## IV.    Acquisition of the Company

From 2019 onward, Defendant's business was conducted entirely through the U.S. entity TagXLabs or OmniX.  *Id.*; DX85; AlSayer Decl. ¶ 43.  No debt to Tags Lab was placed on the books of OmniX.  AlSayer Decl. ¶¶ 54, 62.  Accounting documents prepared by D'Souza for OmniX in 2019 do not show the KNF loan as a liability.  DX75.  Corporate tax returns for the company also do not show the loan as a liability.  DX29, Tr. 154:23.  The Company's affairs were dealt with separately from its prior Kuwait-based operations.  AlSayer Decl. ¶ 54.  There is not a single official corporate document anywhere that states OmniX agreed to pay the KNF loan.  Tr. 161:25.

In 2019, Defendant began to gain customers in the United States.  Tr. 65:5–6.  EverWash, a car wash network with more than 1,000 participating locations, became a customer of the company.  AlSayer Decl. ¶ 57; Tr. 112:13–20.  Kanthan primarily handled the day-to-day relationship with EverWash.  AlSayer Decl. ¶ 58; Tr. 117:7.

On May 10, 2020, AlSayer forwarded Kanthan an email from the KNF requesting that she submit financial data pertaining to the first quarter of 2020.  DX78.  She stated "I keep on getting this I am ignoring but they have been persistent."  *Id.*  Kanthan responded "I'm not really clear on what was your last dialog but we have discussed asking for a formal meeting to discuss paths to reduce debt or extend payments.  We can come up with some version of financial statements if needed, story is we decided to expand in the US etc., that its now funded by

investment from others." *Id.* On May 12, 2020, the KNF again emailed AlSayer requesting financial data pertaining to April 2020. PX48. AlSayer forwarded the email to Kanthan, who forwarded it to D'Souza with the statement "I think we may have to submit something but with what we are doing in the US now . . . lets discuss how to make this work." *Id.* D'Souza then responded with "the basic list of sales (Jan–Apr 2020) and expenses (Apr 2020) of omniX to be submitted to KNF." *Id.* She continued: "It can be notified to KNF that we conducted extensive market research and realized we had more opportunities and potential in the US Market and hence shifted our focus to the US due to which our operational revenue and expenses are being incurred in the US." *Id.* AlSayer did not actually respond to the KNF until several months later, in September 2020. PX49.

Also on May 12, 2020, AlSayer stepped down from her position as CEO and on the Company's board. DX80; AlSayer Decl. ¶ 86. She had disagreed with Kanthan on certain issues and no longer wanted to be involved with the business. AlSayer Decl. ¶ 45. Kanthan therefore became CEO of the Company. DX80; Decl. ¶ 8.

The corporate resolution accepting AlSayer's resignation and appointing Kanthan as CEO also changed the name of the Company from TagXLabs to OmniX, ratified certain past actions of the Company, effected a stock split, and amended the bylaws of the Company. DX80. The amendment ratified prior stock purchases and SAFE[9] financing, listing the investors in the Company. *Id.* It also ratified the convertible note issued to IDEO. *Id.* The resolution does not mention any financing from the KNF. *Id.*; Tr. 161:15.

---

[9] SAFE stands for "Simple Agreement for Future Equity," DX80, and is an alternative to a convertible note popular among startups seeking seed financing, *see Simple Agreement for Future Equity (SAFE)*, Representing Startups § 4:10 (2024–2025 ed.).

On September 15, 2020, AlSayer responded to the earlier KNF request for data, submitting a list of sales and expenses from 2020 and copying the exact text from D'Souza's earlier email to explain that OmniX was now focused in the United States.  PX49.  The KNF immediately responded that it also had not received data from 2019 and that further detail was required.  *Id.*  When D'Souza was notified of this request, she provided accumulated balance reports for the years 2018 and 2019.  PX49.  D'Souza stated that the reports show that "[w]e have spent around KWD 335K on software development costs" and "[l]ong term Kuwait fund amount received is KWD 400K," items which are reflected on the attached trial balance for "TagXLabs – Kuwait."  *Id.*  Kanthan noted in an email addressed to AlSayer, but only actually sent to D'Souza, that the spreadsheets do not show any "US data here as the entries are completely separate," which "aligns with your explanation to KNF that We moved to the US. So the KWF entity is really doing nothing."  DX85.

At some point between late 2020 and May 2021, EverWash and OmniX began negotiations for EverWash to acquire OmniX.  AlSayer Decl. ¶ 60; DX90.  On March 17, 2021, AlSayer emailed Kanthan stating that there were "2 things we still need to close," one of which was "Kuwait National Fund."  PX50.  Kanthan responded "I'm not doing Kuwait fund, you can handle," and that "to me it's on track to close."  *Id.*  On May 10, 2021, AlSayer emailed the KNF stating that "[w]e have been struggling to get business in Kuwait and COVID of course has been tough . . . as of 2020 we have been getting some traction from the US. We are currently in deals that might change the course of our business."  PX51.  She enclosed accumulated balance reports for 2018 and 2019 for "TagXLabs – Kuwait" and asked the KNF to "give us till September."  *Id.*

On May 18, 2021, EverWash and OmniX signed a letter of intent for EverWash to acquire OmniX.  PX90.  From that time until the transaction closed, Kanthan and EverWash

13

CEO Scott Caplan ("Caplan") communicated with AlSayer about the transaction and provided

her drafts of purchase and sales agreements. Tr. 101:24–102:2; 102:9–14. She met with

Kanthan about the transaction and raised specific concerns with Kanthan and D'Souza. DX91,

94, 96. AlSayer was therefore aware that EverWash was conducting due diligence on OmniX.

DX 1B ("Caplan Decl.") ¶¶ 4–5. Prior to November of 2021, she did not disclose the existence

of the KNF loan to EverWash. Tr. 163:18–24; Caplan Decl. ¶¶ 4–6; Kanthan Decl. ¶ 30.

> On August 29, 2021, AlSayer emailed Kanthan:

> "You gave your word that KNF will be taken care of down the line. We agreed not
> to connect the companies as to protect the US entity . . . I have been left holding
> the bag here with all this debt pinned on me personally. This is a company debt."

PX53. Kanthan responded:

> "Re KNF you were in charge of this one. I cannot help in such a country and you
> know that. This was on you to negotiate a deal, a compromise, . . . even a long
> payment plan. All was discussed. We provided you support with the financials etc.
> . . . Unfortunately, it seems you have done a poor job of negotiating and now you
> blame me for it."

*Id.* AlSayer responded:

> "As for KN[F] I was shocked to hear you are on honoring that and how the picture
> changed. Let be clear negotiating etc is different than honoring this is a company
> debt. I will still negotiate and work a deal but all that now falls on me to pay. . . .
> Simplify you decided to change your mind and will not honor KNF."

*Id.*

> On November 5, AlSayer was informed that the acquisition was "pretty much now ready"

and that "Press Release will go out on Wednesday with Customer and Employee comms on

Tuesday." PX96. She was also informed of "a few changes" to the transaction documents from

what she was previously aware of, including a new indemnification provision. *Id.* On

November 7, she was provided with the rollover and release agreement and the merger

agreement, and her concerns about the agreements were addressed on a live call. *Id.*; Kanthan

Decl. ¶¶ 31–32; Tr. 102:9–14.  On November 12 and 13, AlSayer raised concerns with EverWash and with OmniX asking to be taken off indemnification provisions in the agreement. DX97, 98.  She then stated:  "Let's close this deal and celebrate!"  DX98.  She did not raise the KNF loan in any of these discussions.  Kanthan Decl. ¶¶ 31–34.

On November 15, 2021, a press release was issued stating that EverWash "has acquired omniX Labs," PX55, and on November 16, 2021, Kanthan sent AlSayer an email stating that OmniX had received a definitive offer to be acquired by EverWash, DX 100.  The Company then sent the final voting documents to the shareholders for approval.  DX100; Kanthan Decl. ¶¶ 34–35.  On November 28, 2021, AlSayer emailed OmniX counsel and raised certain compensation issues related to the transaction, including compensation for "walking away with a debt of $1.5 million for OmniX that I will be paying," identified later in the email as the KNF debt.  DX 103.  She asked for $200,000 to compensate her for this debt.  DX103.  In the same email, she asked for compensation for signing over intellectual property, despite the fact that she had already assigned her intellectual property to the corporation in 2017.  *Id.*; DX40; Tr. 152:21–153:1.  She testified that she felt she was "getting screwed" and "was just trying to get whatever I can so I can actually be ready when the KNF comes."  Tr. 153:4–6, 154:8–13.  AlSayer then retained counsel.  Tr. 153:8–9.

On December 2, 2021, AlSayer's counsel sent a letter to Kanthan and OmniX counsel reiterating that AlSayer "has a personal obligation on a $1.5 million loan made by Kuwait National Fund to Tags Lab which must be addressed as part of the transaction."  PX58.  OmniX responded on December 11 denying responsibility for the loan.  DX106.  The Agreement and Plan of Merger between OmniX and EverWash, which is dated December 21, 2021, does not disclose the KNF loan as a liability of OmniX.  DX15; Caplan. Decl. ¶¶ 10–11.  The deal

between OmniX and EverWash closed on January 12, 2022, and OmniX became a subsidiary of EverWash. Caplan Decl. ¶ 2. As part of the transaction, Kanthan deposited $250,000 of his cash portion of the sale in an escrow account, to be used to indemnify the parent for potential liabilities including this lawsuit. DX15 at 5; *id.* Art. 10, Tr. 74:10–19. Kanthan also testified that the Company had the right to reclaim $500,000 worth of shares, making his potential personally liability from this lawsuit $750,000. Tr. 74:24–75:10.

## V.    Status of the Loan

This lawsuit was filed on March 31, 2022. Dkt. No. 1. During the pendency of this lawsuit, Plaintiff has received further communications from the KNF. PX67, 68. On June 9, 2022, Plaintiff received a request for financial reports for December 2021–May 2022, and responded that "[t]he company has gotten acquired and we need to move into payment settlement on the loan." PX68. On August 8, 2022, she was given a "Final Warning" that if she did not provide an audited balance sheet for the fiscal year ending in December 2021, the KNF would take legal action. *Id.* On June 6, 2023, she received another "Final Warning" pertaining to the submission of balance sheets for the fiscal year ending in December 2022. PX67. On September 3, 2023, she was asked to contact the KNF urgently by phone regarding Tags Lab. *Id.* On June 4, 2024, she received a "Final Warning" corresponding to the fiscal year ending December 2023. *Id.*

## CONCLUSIONS OF LAW

Plaintiff brings claims for 1) breach of oral agreement, 2) breach of implied agreement, 3) unjust enrichment, 4) indemnity, and 5) declaratory relief. *See* Dkt. No. 1 ("Complaint" or "Compl."). The claim for declaratory relief seeks an order "declaring that the Company is fully and completely liable for any obligations of Ms. AlSayer in connection with the Loan Agreement." *Id.* ¶ 55.

## I.    Breach of Oral or Implied Agreement

The elements of breach of contract under New York law are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Sackin v. TransPerfect Glob., Inc*., 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017); *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 616 (S.D.N.Y. 2024).[10]

"To form a valid contract . . . there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).  In determining the existence of an oral agreement, "courts in this Circuit consider: (1) whether a party expressly required the agreement be in writing to be enforceable; (2) partial performance of the contract; (3) whether the parties agreed to all of the alleged contract terms; and (4) whether the agreement at issue is the type of contract that is usually written." *Ramgoolie v. Ramgoolie*, 2021 WL 8013769, at *5 (S.D.N.Y. Nov. 24, 2021) (citation omitted), *report and recommendation adopted*, 2022 WL 669868 (S.D.N.Y. Mar. 4, 2022); *see also R.G. Group, Inc. v. Horn & Hardart Co*., 751 F.2d 69, 75 (2d Cir. 1984) (noting that "[n]o single factor is decisive"); *Winston v. Mediafare Ent. Corp*., 777 F.2d 78, 80–84 (2d Cir. 1985).

"A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Jemzura v. Jemzura,* 330 N.E.2d 414, 420 (N.Y. 1975) (internal citations omitted); *see Parsa v. State,* 474 N.E.2d 235, 237 (1984) (an implied-in-fact contract "rests upon the conduct of the parties and not their verbal or written words"); *Hercules*

---

[10] The parties have consistently applied New York law to AlSayer's breach of contract claims. *See Bennett v. Sterling Planet, Inc*., 546 F. App'x 30, 33 (2d Cir. 2013) (summary order) ("In a diversity case, where the parties have agreed to the application of the forum law—as evidenced by reliance on that law in the parties' briefing, as in this case—their agreement ends the choice-of-law inquiry.").

*Inc. v. United States*, 516 U.S. 417, 423 (1996) ("An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" (quoting *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923))). "It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Jemzura*, 330 N.E.2d at 420. An implied contract requires the same elements as an express contract, such as "consideration, mutual assent, legal capacity and legal subject matter." *Greer v. Fox News Media*, 2023 WL 2671796, at *2 (2d Cir. Mar. 29, 2023) (quoting *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n.5 (2d Cir. 2000)); *see TMS Ent. Ltd. v. Madison Green Ent. Sales, Inc.*, 2005 WL 476663, at *5 (S.D.N.Y. Feb. 28, 2005). However, rather than being explicitly stated, the existence and terms of the contract must be inferred from "such factors as the specific conduct of the parties, industry custom, and course of dealing." *Greer*, 2023 WL 2671796, at *2 (quoting *Nadel*, 208 F.3d at 376 n.5); *see Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (noting that the terms of an implied contract "turn on the conduct of the parties").

"Under New York law, an agreement is enforceable if a meeting of the minds has occurred as to the contract's material terms." *Krolick v. Sloane*, 2021 WL 5280990, at *4 (S.D.N.Y. Nov. 12, 2021) (quoting *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 270–71 (S.D.N.Y. 2005)). "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). This doctrine serves the dual purposes of ensuring the agreement is judicially enforceable and ensuring "that courts will not

impose contractual obligations when the parties did not intend to conclude a binding agreement." *Id.*; *see Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021) ("[I]f the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." (citation omitted)), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021).  However, "not all terms of a contract need be fixed with absolute certainty," *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Express Indus. & Terminal Corp. v. N. Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)), and courts should not apply the doctrine of indefiniteness to "defeat the reasonable expectations of the parties in entering into the contract," *Cobble Hill Nursing Home*, 548 N.E.2d at 206.  "When a court encounters indefinite terms, but finds that the parties did intend to form a contract, . . . the court then must attempt to attach a sufficiently definite meaning to [the] bargain." *Caro Cap.*, 2021 WL 1595843, at *6 (quoting *B. Lewis Prods., Inc. v. Maya Angelou & Hallmark Cards, Inc.*, 2005 WL 1138474, at *6 (S.D.N.Y. May 12, 2005)).

### A.    Oral Agreement

Here, there is no oral agreement between AlSayer and OmniX.  There is no evidence of any spoken words that would establish such an agreement.  AlSayer testified only that she and Kanthan verbally agreed the loan was a "business loan" and that they would "figure out" how to repay it.  Tr. 141:1–142:16; *see* DX20 at 55 ("When OmniX exits or when we grow to X million, we'll figure it out.").  These words alone do not establish that the Delaware entity OmniX was bound to repay the loan.  The statement that AlSayer and Kanthan would "figure it out" is at most an unenforceable "agreement to agree" on how to handle the loan at a future time.  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981).  It is also not

clear whether "we" refers to AlSayer, Kanthan, or any of the corporate entities with which they were associated.[11]  Considered alone, these words are too vague and indefinite to establish that OmniX would be responsible for the KNF loan.

### B.    Implied Agreement

However, the existence of an implied agreement that OmniX would be responsible for repaying the KNF loan can be inferred from the conduct of the parties.  From beginning to end, OmniX treated the loan as in substance a loan to OmniX.  OmniX was responsible for AlSayer taking out the loan in the first place, as AlSayer and Kanthan sought the loan to fund the fledgling OmniX business.  AlSayer Decl. ¶¶ 17, 25–26; PX2; Tr. 142:4–8.  The only reason OmniX did not take out the loan itself is that it did not fulfill the KNF requirements.  AlSayer Decl. ¶¶ 16–18.  A KNF loan could only go to a Kuwaiti company with Kuwaiti ownership, and OmniX was a Delaware company.  *Id*.  Therefore, AlSayer, who was a Kuwaiti citizen, offered to create a Kuwaiti entity to secure the loan funds.  *Id.*; Tr. 158:9–13.  AlSayer did not take out the loan to benefit herself personally or to benefit Tags Lab, which had no independent business, but to benefit OmniX.  At the time these discussions were taking place, it was well understood that the purpose of the loan was to fund OmniX, and that the loan would be in substance a loan to OmniX.  Therefore, the implied offer was that AlSayer would incorporate a Kuwaiti entity and sign for the loan, but OmniX would be the entity ultimately responsible for repaying the loan.

---

[11] AlSayer testified that these statements were made in March 2017, before OmniX was incorporated.  Tr. 141:1–142:16.  This does not necessarily mean OmniX could not be bound, as "[u]nder New York law, a corporation is bound by a contract, executed in its name prior to its formation, when it ratifies, adopts, or accepts the contract after the formation." *In re Nina*, 562 B.R. 585, 595 (Bankr. E.D.N.Y. 2016).  However, it creates additional uncertainty as to whether any statements made at this time were intended to bind the later-incorporated entity, as opposed to AlSayer, Kanthan, or some other entity.

"It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 403 (2d Cir. 2004) (citing Restatement (Second) of Contracts § 69(1)(a) (1981) ("[S]ilence and inaction operate as an acceptance . . . [w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know they were offered with the expectation of compensation." (alteration in original))). Here, as soon as the loan funds were received, they were immediately used to pay OmniX expenses. PX40. OmniX did not object to this, but on the contrary affirmatively stated that it had received funding from the KNF and used its receipt of that funding as a selling point in attracting further investment. PX 11, 12, 15, 16, 24, 27; DX88. It accepted the use of the funds to pay OmniX invoices and expenses routinely for approximately a year. PX40. *Cf. Beth Israel Med. Ctr.,* 448 F.3d at 582 (finding an implied contract when "payments were made and accepted without objection"); *Money Tree Cap. Funding, LLC v. Money Tree Cap. Markets LLC*, 2023 WL 7412278, at *10 (S.D.N.Y. Nov. 9, 2023) (finding an implied contract when one company allowed another company to make mortgage loans with its funds). Kanthan, who was an employee of OmniX and not Tags Lab, took responsibility for financial reporting to the KNF to ensure that the contractual requirements for the loan were met. Tr. 42:1–15, PX 13, 31, 36, 37, 39. He and others blurred the lines between OmniX and Tags Lab by referring to Tags Lab as a part of the company and allowing it to do business as "TagXLabs." PX13, 14, 31, 36, 37, 39. OmniX did not disavow the funds but treated the loan as a loan to itself. This demonstrates acceptance of the obligation to repay the loan.

21

Under the circumstances, OmniX could not have believed that the loan funds were offered without "the expectation of compensation." Restatement (Second) of Contracts § 69(1)(a) (1981). There is no evidence that AlSayer took responsibility for the loan as a gift to OmniX, nor is this a logical inference. The motivation for seeking the KNF loan was to fund OmniX without tapping AlSayer's family money. Tr. 142:4–8. AlSayer taking out a personal loan to fund the Company is inconsistent with this motivation, as it places financing for the project right back on AlSayer and her family. It was also apparent that Tags Lab itself would not repay the loan, as it was a shell company with no independent business. Tr. 132:5, 143:12–13; 167:9–11. This is a transaction between interrelated parties who all well understood the scheme: the loan was going to be used for OmniX, and Tags Lab existed only to satisfy the KNF requirements. There is evidence that AlSayer and Kanthan hoped that the loan would never need to be repaid, and that the KNF would forgive or reduce it. PX53; Tr. 107:1–4. But that is separate from the issue of who would bear the risk, if the KNF did not agree to forgive or reduce it. There would have been no reason for AlSayer to offer to take out a loan which would solely benefit the Company, but for which she would receive no compensation and personally would bear all the risk.

Moreover, OmniX's conduct shows that it was concerned with the risks of the loan, as well as the benefits. Kanthan, who was an employee only of OmniX, took responsibility for the financial reporting necessary to avoid default. Tr. 42:1–15, PX 13, 31, 36, 37, 39. Even after all the loan funds were spent, OmniX employees Kanthan and D'Souza continued to help AlSayer avoid repayment or default. DX78, 85; PX48, 49. If OmniX was not ultimately responsible for the loan, there would be no reason for its employees to be concerned about whether reporting requirements were satisfied or a default occurred. This conduct demonstrates an understanding

on the part of OmniX that it had a financial stake in the loan and whether the KNF sought repayment of it.

Defendant has not in fact argued that AlSayer provided the financing as a gift to the Company.[12]  Rather, it has argued that "the Loan was for the benefit of Ms. AlSayer and her other companies, not OmniX," because AlSayer and "her companies" received the funds.  Dkt. No. 92 ¶¶ 33, 35.  This argument is factually and legally unsound.  Putting aside that a portion of the loan funds went to various companies and individuals performing services for OmniX who were entirely unrelated to AlSayer,[13] none of the KNF funds were simply gifted away.  The funds were paid out to fulfill contracts with both related and unrelated entities which were providing services and consulting to build TagXLabs.  For example, Creative House was paid for "design and build of the omnixlabs.com site."  PX37; Tr. 174:2–4.  TagStone was paid for software maintenance and support.  PX17; Tr. 170:13–22; AlSayer Decl. ¶ 35.  Defendant has offered no evidence that these contracts were shams or that the work was not actually performed. Kanthan is CEO of OmniX and has been closely involved with its finances since its founding.  If

---

[12] Notably, if this were the case, Kanthan would necessarily have been aware of this plan and would be strongly motivated to explain it now.  Instead, his story has consistently been that the loan funds were not used for OmniX at all.  DX108; Kanthan Decl. ¶ 26.  The Court finds this testimony to lack credibility and to be contradicted by the documentary evidence that Tags Lab spent money on OmniX projects, PX13, 14, 17, 18, 31, 33, 34, 36, 37, 39, and in fact had no independent business other than funding the development of OmniX, Tr. 132:5, 167:9–20.

[13] Defendant and Kanthan attempt to distinguish between AlSayer's personal funds deposited into the Gulf Bank account and the loan funds, suggesting that only the former were used to pay OmniX expenses.  Tr. 45:11–13, 51:18–22, 86:13–87:21.  However, the financial records themselves reflect no such distinction—AlSayer's personal funds were initially used to pay TagStone invoices that Kanthan testified were not related to OmniX, and one of the first payments from the loan funds is a payment to IDEO that indisputably was related to OmniX. PX40.  Moreover, AlSayer's personal funds deposited into the account were deposited there because the KNF required loan applicants to put their own capital into the business equivalent to 20% of the loan funds.  PX9.  Kanthan's testimony that AlSayer had to use the loan funds for the loan entity Tags Lab, but could properly use her own capital for the unrelated entity OmniX, is illogical and incredible.  Tr. 87:20–21.

other companies in fact built OmniX's prototypes, maintained its software, and conducted initial marketing during 2017 and 2018, Kanthan could have produced evidence that this was the case. He has not.  His mere assertions that the relevant contracts were made to benefit Tags Lab, a shell company which had no independent business, are not credible.  Since the money was used to pay invoices and contracts which would otherwise have been payable and paid by OmniX, it went to OmniX.  It is of no legal significance that the money was transferred directly to the service providers in satisfaction of OmniX's obligations to the service providers, rather than being transferred to OmniX, which could then transfer it to the service providers.

Defendant relies heavily on the legal separation of OmniX from Tags Lab and the lack of legal documentation or disclosure of the loan.  Dkt. No. 94 at 4–7; Dkt. No. 92 ¶¶ 13, 18, 25–32, 44–45.  The evidence suggests that AlSayer and Kanthan made a conscious choice to organize legally independent entities in the United States and Kuwait to do "TagXLabs" business, PX53, Tr. 164:21–165:2, although the Kuwaiti entity Tags Lab existed solely to subsidize the primary United States entity.  After the Kuwaiti entity used the KNF funds to pay OmniX expenses, the United States entity continued to use the presentations, legal documents, and software that had been paid for by that entity, but it did not document any obligation to repay the funds.  AlSayer Decl. ¶¶ 54, 62; DX29, 75; Tr. 161:25.

Defendant argues that this supports an inference that no such obligation existed. Defendant suggests that the absence of the obligation on the books and records of OmniX, and AlSayer's failure to disclose the obligation as EverWash was conducting due diligence, are contemporaneous statements which undermine her present testimony that OmniX is liable for the loan, suggesting that she only developed this understanding after the fact.  But, on the contrary, the evidence reflects that Al Sayer consistently expressed and stated the understanding that

OmniX would repay the loan if necessary, and it is Kanthan who changed his tune only after AlSayer left the Company. During 2017 and 2018, Kanthan and AlSayer repeatedly represented that the Company had received money from the KNF. PX 12, 15, 16, 24, 27. Up through May 2020, AlSayer and Kanthan strategized together to frame OmniX financials for the KNF, discussing how to "reduce debt or extend payments" given that the company "decided to expand in the US" and is "now funded by investment from others." DX78. The two of them presented a united front. After AlSayer stepped away from the company, she continued to press Kanthan to resolve the KNF issue in private conversations. PX50, 53. However, Kanthan now denied any responsibility, stating that the loan fell solely on AlSayer. PX50, 53. Although AlSayer's failure to record the loan on the books of OmniX may have violated her corporate duties or exposed her to liability, Kanthan Decl. ¶ 24; Dkt. No. 92 ¶¶ 22, 23, 30; her private actions in the same time period are consistent with the story that the KNF loan was an OmniX obligation.[14] By contrast, Kanthan's actions beginning in 2020 to frame the loan as a personal obligation of AlSayer are inconsistent with his prior actions of using the KNF money for OmniX, referring to Tags Lab and OmniX as a single entity, and creating movement reports for the KNF that included OmniX expenses.[15]

---

[14] Only one official corporate action of OmniX clearly weighs against AlSayer's version of events: the Unanimous Written Consent signed in conjunction with AlSayer leaving the company. DX80. This document laid out the finances of the Company in some detail, but did not include any obligation to the KNF. *Id.* Previous resolutions have little probative value, as they did not purport to provide a thorough list of the Company's assets and liabilities. *See* DX74. Later corporate documents also have little probative value, as after AlSayer left the Company, Kanthan had obvious motives not to disclose the loan.

[15] Because "fact finders examining intent are instructed to look to the time of contracting," and must consider the intentions "manifested at that time," the validity of OmniX's contract with AlSayer in 2017 cannot depend on OmniX's corporate actions in 2020. *Consarc Corp. v. Marine Midland Bank*, N.A., 996 F.2d 568 (2d Cir. 1993). Rather, such actions are merely evidence of whether the parties agreed at an earlier time that OmniX would take responsibility for the loan.

The evidence establishes that in 2017–2018, AlSayer and Kanthan treated the loan to AlSayer as in substance a loan to OmniX. The entire benefit of the loan went to OmniX, with Tags Lab merely a vehicle used to obtain and administer the loan without breaching KNF requirements. The evidence demonstrates the existence of an implied agreement that AlSayer would sign for the loan, and OmniX would ultimately be responsible for repaying it.

### C.    Statute of Frauds

Defendant argues that the implied agreement is barred by the statute of frauds because it 1) cannot be performed within a year of its making and 2) is a promise to pay the debt of another person. Dkt. No. 94 at 7–8. This argument is unavailing.

The New York statute of frauds states that an agreement not in writing is void if the agreement:

> 1. By its terms is not to be performed within one year from the making thereof . . .;
>
> 2. Is a special promise to answer for the debt, default or miscarriage of another person;

N.Y. General Obligations Law § 5-701(a). Defendant argues that both of these clauses apply. Dkt. No. 94 at 7–8. Defendant argues first that the alleged promise to repay the loan cannot be performed within one year, because although the contract was signed in 2017, "the sums allegedly to be repaid didn't come due until at least January 2019 and were to be paid in

---

Defendant has not argued that AlSayer's decision not to place the loan agreement on the books of OmniX constituted waiver of her rights under that agreement. "Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a 'clear manifestation of an intent by plaintiff to relinquish her known right' and 'mere silence, oversight or thoughtlessness in failing to object' to a breach of the contract will not support a finding of waiver." *Beth Israel Med. Ctr.*, 448 F.2d at 585 (quoting *Courtney–Clarke v. Rizzoli Intern. Publications, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)). AlSayer continued to urge Kanthan to take responsibility for the loan despite it not being on the corporate books, PX50, 53, and it is not clear from the evidence presented that she intended to waive her rights.

36 installments thereafter." *Id.* at 8.  It additionally argues that the alleged contract falls within

the statute of frauds because it is a promise of OmniX to answer for the debt of AlSayer.  *Id.*

The first prong of the statute of frauds applies only to those agreements which "have

absolutely no possibility in fact and law of full performance within one year." *Kermanshah*

*Oriental Rugs, Inc. v. Latefi*, 858 N.Y.S.2d 160, 161 (1st Dep't 2008) (quoting *D & N Boening v.*

*Kirsch Beverages*, 472 N.E.2d 992, 993 (N.Y. 1984)).  "A contract that is 'capable' of being

performed within one year of its making is outside the statute." *Zaitsev v. Salomon Bros.*, 60

F.3d 1001, 1003 (2d Cir. 1995) (quoting *N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 239

N.E.2d 189, 191 (N.Y. 1968)).  A contract is not capable of being performed within one year "if

it is terminable within that time only upon the breach of one of the parties." *Ohanian v. Avis*

*Rent A Car Sys., Inc.*, 779 F.2d 101, 107 (2d Cir. 1985).

OmniX's agreement to be responsible for AlSayer's obligations to the KNF  was

performable within one year.  The KNF loan agreement explicitly provided that AlSayer could

repay the loan early.  PX9 at 4.  At any time, OmniX could have simply returned the loan funds

to AlSayer and told her to return them to the KNF.  This would have constituted full performance

of its obligation to be responsible for the loan.  OmniX does not offer any reason that such action

would have constituted breach of the agreement, rather than performance. *See Ohanian*, 779

F.2d at 107.  The fact that repayment was anticipated to occur more than one year after the

contract was made does not place the agreement within the statute of frauds, because "there was

nothing prohibiting defendant from repaying the loan within one year." *Centi v. McGillin*, 66

N.Y.S.3d 337, 339 (3d Dep't 2017), *aff'd*, 139 N.E.3d 390 (N.Y. 2019).  Courts have

consistently held agreements to repay loans to be outside of the statute of frauds in similar

circumstances. *See Rosbach v. Indus. Trading Co.*, 81 F. Supp. 2d 522, 526 (S.D.N.Y. 2000)

(holding agreement to repay loan was enforceable because though the term of the loan was in excess of one year, "[n]othing . . . suggests that Defendants could not have repaid the loan within a year from the date of the Loan Agreement"); *JNG Const., Ltd. v. Roussopoulos*, 22 N.Y.S.3d 567, 568 (2d Dep't 2016) (holding that agreement to repay loan which matured fifteen years after it was made was outside of the statute of frauds); *Moon v. Moon*, 776 N.Y.S.2d 324, 326 (3d Dep't 2004) (holding that oral agreement to repay loan via payments between 1995 and at least 2001 was enforceable, because "the oral agreement between the parties was devoid of any restriction against prepayment within one year").

The agreement is also not an unenforceable "promise to answer for the debt, default or miscarriage of another person."  N.Y. General Obligations Law § 5-701(a)(2).  "To fall within New York's statute of frauds, a promise to pay a third party's debts must be made to the obligee."  *Marriott Int'l, Inc. v. Downtown Athletic Club of N.Y.C., Inc*., 2003 WL 21314056, at *4 (S.D.N.Y. June 9, 2003).  "If the promise to pay is made direct to the principal rather than to the obligee, the statute does not apply, and either the principal or the obligee may sue to enforce the promise."  *Id.*; *see Martin Roofing, Inc. v. Goldstein*, 457 N.E.2d 700, 701 (N.Y. 1983) ("There are surety situations in which no writing is required, . . . e.g., . . . where the promise is made to the principal."); *Steinberger v. Steinberger*, 676 N.Y.S.2d 210, 211 (2d Dep't 1998) ("Since the promise allegedly made by the third-party defendant to be primarily liable on the mortgage obligation was made to the third-party plaintiff rather than to the creditor bank, it was not a promise to answer for the debt of another within the meaning of the Statute of Frauds."). The reason for this distinction is that when the promise is made to the obligee, "the benefit to the promisor is not apparent," but when, as here, the promise is made to the obligor, it is generally part of an independent agreement supported by independent consideration.  *Martin Roofing, Inc.*,

457 N.E.2d at 701.  OmniX's agreement with AlSayer that OmniX would be responsible for repayment of the loan in exchange for AlSayer's actions as an intermediary is not within the statute of frauds.  It is not a promise to pay the debts of "another," i.e. a third party to the agreement, it is a promise to pay the debts of AlSayer, a party to the agreement.  *See G. Carver Rice, Inc. v. Crawford*, 444 N.Y.S.2d 748, 748 (3d Dep't 1981) ("The promise here was allegedly made . . . directly to the debtors (Crawfords) to answer for an existing debt that the Crawfords owed to plaintiff.").

### D.    Declaratory Relief

AlSayer has not yet repaid the KNF loan and is not seeking a money judgment.  Rather, she seeks a declaration "that the Company is fully and completely liable for any obligations of Ms. AlSayer in connection with the Loan Agreement."  Compl. ¶ 55.  Defendant argues that such a declaratory judgment is not appropriate because AlSayer has not established damages, which "are an essential element of a breach of contract cause of action."  Dkt. No. 94 at 9.

The issue of whether a declaratory judgment is proper on these facts was addressed by prior opinions in this case.  *See* Dkt. Nos. 49, 67.  On OmniX's motion to dismiss, Judge Torres noted that "[a] claim for declaratory relief is justiciable if there is a substantial controversy of 'sufficient immediacy and reality' that has matured beyond a mere contingency or speculation." Dkt. No. 49 at 8; *see MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007).  She suggested AlSayers's current obligation to repay the KNF loan would present such an immediate controversy, even though the KNF had not attempted to collect.  Dkt. No. 49 at 7–8.  Similarly, on summary judgment, Judge Torres held that "[i]f AlSayer is personally liable for the loan and omniX agreed to repay it, then omniX's refusal to do so would cause AlSayer to be delinquent on the debt—a cognizable injury."  Dkt. No. 67 at 6.

Similar reasoning applies here.  OmniX repudiated its responsibility to repay the KNF loan by email from Kanthan on August 30, 2021, PX53, and again through counsel on December 11, 2021, DX106.  AlSayer is under a current obligation to repay the loan and has received multiple notices from the KNF threatening legal action.  PX67, 68.  AlSayer's obligation to repay the loan is an injury, even if she has not yet repaid it.  *See Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 269 (S.D.N.Y. 2014) (noting that "a legal duty to pay" is an injury, and collecting cases).  The fact that the KNF could seek repayment at any moment, and has threatened to do so, gives the controversy "immediacy and reality."  *MedImmune*, 549 U.S. at 127.  A judgment settling whether AlSayer or OmniX is responsible for repayment would serve the purposes of a declaratory judgment by "clarifying or settling the issues involved" and "finaliz[ing] the controversy and offer[ing] relief from uncertainty."  *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 383 (S.D.N.Y. 2023) (quoting *Optanix, Inc. v. Alorica Inc.*, 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021)).  This is sufficient for the issuance of a declaratory judgment on AlSayer's contract claim.  *See Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (noting that a declaratory judgment may be issued if it is likely litigation will be commenced on an insurance contract, even if no such litigation has occurred).

The declaratory judgment mechanism "creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy."  *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023).  It would be entirely contrary to this purpose to require an individual seeking a declaratory judgment to have already suffered damages for which a coercive remedy is available.  *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241

(1937) ("Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties . . . the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require . . . the payment of damages.").  AlSayer need not be entitled to a monetary judgment for breach of contract to be entitled to a declaratory judgment.

The Court will issue a declaratory judgment that OmniX is liable for AlSayer's obligations to the KNF under the KNF loan agreement and associated surety agreement.[16]

## II.    Additional Claims

An unjust enrichment claim will not lie when "there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact." *Beth Israel Med. Ctr.*, 448 F.3d at 587.  Because an implied contract existed here governing the obligations of the parties, Plaintiff's claim for unjust enrichment must be dismissed.

Plaintiff's claim for indemnification must also be dismissed.  Plaintiff's indemnification claim primarily relies on 8 Del. C. § 143, which allows a corporation to guarantee a loan obligation of an officer or employee "whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation."  8 Del. C. § 143.

---

[16] Throughout this case, Defendant has pressed the argument that AlSayer is not liable to repay the KNF loan because AlSayer and Tags Lab are legally separate entities.  Dkt. Nos. 49, 67, 94. On summary judgment, Judge Torres held that the loan agreement was ambiguous as to whether AlSayer was personally liable, presenting a triable issue of fact.  Dkt. No. 67 at 5.  The issue was not factually developed at trial, beyond conclusory statements that AlSayer was personally liable for the loan. *E.g.* Tr. at 140:17.  Whether AlSayer is generally liable for the debts of Tags Lab, a Kuwaiti sole proprietorship, is an issue of Kuwaiti law which has not been thoroughly addressed by the parties.  However, this issue is not material here because AlSayer also signed as surety for the KNF loan, and she is indisputably personally liable in that capacity.  PX10.  Tags Lab has no assets and will not repay the loan, so there is a live and immediate controversy as to whether AlSayer will be required to repay the loan.  Moreover, the implied contract analysis above applies equally to AlSayer's obligations as surety and her direct obligations, if any, under the loan contract.  The implied contract was simply that if AlSayer signed for the loan, OmniX would be ultimately responsible for it.

The OmniX bylaws reiterate this language and note that the loan may be made "in such manner as the Board of Directors approves."  PX47 § 48.  This is not an indemnification provision.  It is simply a provision allowing a corporation to make or guarantee loans.  There is no evidence here that the corporation OmniX actually did so.  Nothing about the provision suggests that indemnification for loan obligations is mandatory or that an officer has a legal right to indemnification for loan obligations.  The Company's liability to AlSayer in relation to the KNF loan is covered by the terms of the contract between them, not loan provisions of the Delaware code or OmniX corporate bylaws.

Plaintiff also references 8 Del. C. § 145, the Delaware indemnification and advancement statute, and a corresponding provision of the OmniX bylaws.  Dkt. No. 93 at 8 (citing 8 Del. C. § 145; PX47 § 45).  But Plaintiff has no claim under such provisions.  The indemnification provisions relate to the payment of the litigation expenses of a person "who was or is a party or is threatened to be made a party to any . . . action, suit, or proceeding, . . . by reason of the fact that the person is or was a director, officer, employee or agent of the corporation."  8 Del. C. § 145(a); PX47 § 45(c).  The purpose is "to promote the desirable end that corporate officials will resist what they consider unjustified suits and claims."  *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) (citation omitted).  The KNF loan is not an expense Plaintiff has incurred because she was made a party to a proceeding.  It is an obligation arising from a contract with the KNF.  The indemnification provision does not apply to the KNF loan.[17]

---

[17] AlSayer is also not entitled to indemnification under the OmniX bylaws for attorney's fees and expenses incurred in prosecuting this action.  Section 45(a) of the OmniX bylaws specifically states that OmniX "will not be required to indemnify any director or executive officer in connection with any proceeding . . . initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the corporation, (iii) such indemnification is provided by the corporation, in its sole

**CONCLUSION**

For the reasons stated above, the Court awards a declaratory judgment for Plaintiff on her claim for breach of implied agreement.  The Court declares that OmniX is liable for AlSayer's obligations to the KNF under the KNF loan agreement and associated surety agreement.  The Clerk of Court is respectfully directed to enter Judgment in favor of Plaintiff and close this case.

SO ORDERED.

Dated: January 15, 2025
      New York, New York                          LEWIS J. LIMAN
                                         United States District Judge

---

discretion, pursuant to the powers vested in the corporation under the DGCL or any other applicable law or (iv) such indemnification is required to be made under paragraph (d) of this Section."  PX47 § 45(a).  Paragraph (d) requires indemnification when a successful judicial action has been brought for indemnification.  *Id.* § 45(d).  This proceeding was initiated by AlSayer, and none of the exceptions are applicable.  Therefore, OmniX is not required to indemnify AlSayer under its bylaws for expenses in this proceeding.